IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIMON BANKS, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | Civil Action No. 08-0215 (RCL) |
| | : | |
| HON. NOEL ANKETELL KRAMER, *et. al.,* | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

**DEFENDANT COUNCIL FOR COURT EXCELLENCE'S REPLY IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE**

Defendant Council for Court Excellence ("CCE") respectfully renews its request that

the Plaintiff's claim against CCE be dismissed with prejudice.  Neither Plaintiff's Amended

Complaint nor his Opposition to CCE's Motion to Dismiss articulate any legally cognizable

cause of action as against CCE, nor does either paper explain how Plaintiff has standing to

bring a claim against CCE in the first instance.  Plaintiff also fails to rebut that the statute of

limitations bars Plaintiff's lawsuit and that CCE is immune from suit for work done in its

capacity as a government contractor and policy advisor for the Council of the District of

Columbia ("D.C. Council").  In sum, Plaintiff's arguments are not supported by law or fact and

are inadequate to maintain any civil suit against CCE.

Finally, Plaintiff's assertion that CCE "fraudulently concealed" its role in advising the

D.C. Council regarding legislation that later became the Office of Administrative Hearings

Establishment Act of 2001, enacted by the D.C. Council  as D.C. Law 14-76 on March 6, 2002,

is directly refuted by the legislative history of that law.  That legislative history (appended

hereto as Exhibit A) reflects that CCE publicly presented its report and recommendations to the

D.C. Council at a public hearing held on May 23, 2001.  The legislative history also shows that

Plaintiff not only attended that May 23, 2001 hearing and heard CCE's presentation, but in fact

presented his opposing views at that same hearing.   Indeed, the legislative history records

Plaintiff's testimony at that public hearing as follows:

> Dr. Banks testified in opposition to requiring attorneys who appear
> before the Office of Administrative Hearings to be members of the
> D.C. Bar. He stated that the Council should be mindful of the
> origins and the interests that are behind the proposed legislation,
> including the Council for Court Excellence. Dr. Banks testified
> that in his opinion the Council for Court Excellence has a conflict
> of interest in developing this legislation, and raised concerns
> expressed by council members during the last Council period.

*See* September 25, 2001 Report of Kathy Patterson, Chairperson, Committee of the Judiciary,

to the D.C. Council regarding Bill 14-208 the "Office of Administrative Hearings

Establishment Act of 2001," attached hereto Exhibit A at pg. 23.

Thus, the legislative history itself reveals that CCE's role was in no way "concealed,"

and that Mr. Banks publicly aired his views regarding CCE's engagement by the District,

CCE's report and recommendations, and the ultimate legislation at that public hearing more

than seven years ago.  The instant lawsuit is simply a reiteration of Mr. Banks' views

expressed at the hearing.  The lawsuit is manifestly untimely and devoid of any legally

cognizable claim against CCE.  It should be dismissed forthwith.

## ARGUMENT

### I.    Plaintiff Fails to State a Cognizable Claim Against CCE.  The Complaint Against CCE Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiff's sole (conclusory) argument against dismissal on Fed. R. Civ. P. 12(b)(6)

grounds is that "Plaintiff has shown that there are sets of facts in support of his claim that CCE

generated a sham study and analysis pursuant to its contract with the District of Columbia

Government that resulted in the District of Columbia Administrative Hearing and Establishment Act of 2001." *See* Opposition at 6. This argument, however, fails completely to explain: (1) what facts demonstrate the alleged "sham study and analysis"; (2) how, even if CCE did engage in a "sham study and analysis," such conduct serves as the basis for a civil action by the Plaintiff against CCE; and (3) what cause of action Plaintiff is even asserting as against CCE. Plaintiff's complaint fails to meet the most basic rule of pleading, as it fails to set forth a short and plain statement of the claims and is so confused as to be unintelligible. *Ciralsky v. CIA*, 355 F.3d 661, 670 at n. 9 (D.C.Cir.2004).

As set forth in CCE's Motion to Dismiss, the nature of the claim asserted and Plaintiff's rationale for naming CCE as a defendant in this case remain opaque, but it is certain that the Complaint does not assert a legally cognizable cause of action as against CCE. Plaintiff's Complaint against CCE is a classic example of a pleading that should be dismissed with prejudice under Rules 8(a) and 12(b)(6).

II.    **Plaintiff Lacks Standing to Bring Any Cause of Action Against CCE.**

Plaintiff asserts that he satisfies the requirements for Article III standing to maintain a civil action because he is "an aggrieved person." *See* Opposition at 18. But simply having a generalized grievance does not automatically confer standing. Standing under Article III requires that plaintiff demonstrate, at an "irreducible constitutional minimum," that (1) he has suffered a concrete and particularized injury--the invasion of a legally protected interest ("injury in fact"); (2) the injury can fairly be traced to the challenged action of the defendant and is "not the result of the independent action of some third party" ("causation"); and (3) it is "likely, as opposed to merely speculative," that the relief sought will alleviate plaintiff's alleged injury ("redressability"). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Simply making outlandish allegations (wholly unsupported by fact) does not establish standing as a matter of law. None of the three essential elements of standing are met in Plaintiff's Complaint against CCE.

A.    Plaintiff Has Suffered No "Injury In Fact"

As noted in CCE's Motion to Dismiss, Plaintiff does not allege any deprivation that rises to the level of an "injury in fact" that satisfies the Court's Article III standing inquiry. Plaintiff alleges that he was competitively disadvantaged by the enactment of the Office of Administrative Hearings Establishment Act of 2001. Prior to the law's enactment, Plaintiff made a practice of holding himself out to the community and prospective clients as a legal authority and former Administrative Law Judge—despite never having been admitted to any Bar, nor ever holding the title of Administrative Law Judge.[1]   Plaintiff contends that this law deprived him of the ability to conduct his business and represent clients before administrative tribunals and that this deprivation is actionable.

It is true that one of the principal purposes behind the enactment of the Office of Administrative Hearings Establishment Act of 2001 was to prevent unlicensed and unqualified individuals from injecting themselves into the administrative hearing system. As Plaintiff is not licensed to practice as an attorney, the law would have prevented him from representing individuals before OAH administrative tribunals in the District of Columbia. However, Plaintiff fails to join the critical argument with regard to this alleged "deprivation." Plaintiff has no independent Constitutional or legal right to practice law if he has not satisfied the minimum criteria to be admitted to the Bar. Plaintiff does not contest the fundamental principle that it is exclusively within the power and authority of the courts and the legislature

---

[1]      Based upon Plaintiff's acknowledgement that he was incarcerated from April 2004-April 2006, it appears that Plaintiff continued to make such representations after the law was enacted, as well.

to set minimum standards for the practice of law, either in Article III courts or before

administrative tribunals. *See Yeiser v. Dysart*, 267 U.S. 540, 541 (1925) ("When . . .an

attorney practices under a license from the State . . . it is obvious that the State may attach such

conditions to the license in respect to such matters as it believes to be necessary in order to

make a public good."); *see also* D.C. Code § 11-2501. Regardless whether the Office of

Administrative Hearings Establishment Act of 2001 prevented Plaintiff from representing

clients in administrative hearings, this is not a legally cognizable (or actionable) injury as it is

within the discretion of the government to regulate the practice of law as it sees fit.

      B.    <u>In No Way Has CCE Caused Plaintiff Any Harm</u>

      None of Plaintiff's legal rights have been infringed or denied by CCE, with whom

Plaintiff has absolutely no connection. The depth of Plaintiff's confusion with regard to the

actual target of his "grievance" is best underscored in his Opposition brief, which alleges that:

> CCE and the [D.C. Court of Appeals] took actions to deprive
> Plaintiff of his competitive advantage, when it conspired to enact
> legislation, and engaged in legislative activities to require a license
> to practice law as a condition for using the title 'Administrative
> Law Judge,' and when it enacted legislation that required a license
> to practice law before administrative agencies of the District of
> Columbia.

*See* Opposition at 19. As an initial matter, neither CCE nor the Court of Appeals enact

legislation. Neither CCE nor the Court of Appeals "conspired" to enact any legislation, as to

do so is wholly beyond their power. The D.C. Council (and not CCE or the Court of Appeals)

enacted the Office of Administrative Hearings Establishment Act of 2001. It is true that CCE

was engaged by the D.C. Council to undertake a review of local administrative agencies' ad

hoc adjudication procedures and to provide a set of concrete recommendations to improve the

administrative hearing system in the District. It is also true that CCE's report and

recommendations informed the law eventually enacted by the D.C. Council. But CCE's work to assist the D.C. Council with regard to this legislative initiative (which concluded more than eight years ago) has no connection whatever with the Plaintiff.

Paragraph 47 of Plaintiff's Complaint alleges that CCE "generated a sham analysis, committed fraud, and provided a sham statistical analysis of state administrative agencies throughout the United States in connection with its sole-source contract with the District of Columbia Government...." Even if these allegations were construed as true and all reasonable inferences drawn in Plaintiff's favor, none of these allegations could support the inference that Plaintiff's alleged injury "resulted" in some "concretely demonstrable way" from any action taken by CCE. *Warth v. Seldin,* 422 U.S. 490, 505 (1975). If CCE failed to perform any material obligation under its contract with the District, the only party with a potential cause of action would be the District or an intended third party beneficiary of that contract—not the Plaintiff. To the extent Plaintiff makes a bald allegation of "fraud," he fails to plead such fraud with requisite particularity; Plaintiff fails even to cite a single misrepresentation or omission made by CCE upon which he relied to his detriment. As CCE cannot fairly be said to have injured the Plaintiff in any way, Plaintiff has no standing to assert any cause of action against CCE.

C.    The Relief Requested Would Not Redress Any Claimed Injury

Plaintiff's prayer that the Court enter a declaratory judgment and an injunction along the lines requested the Complaint, even if the Court had subject matter jurisdiction to enter such relief, would in no way alter the status quo or redress Plaintiff's claimed injuries and grievances. CCE has no power to make or unmake the law about which Plaintiff complains, nor did it ever have any such power. Such a declaration and/or injunction would change

nothing.  As the requested relief would not redress plaintiff's claimed injury, this is yet another incurable jurisdictional defect.  Plaintiff wholly fails to address this issue in his Opposition brief.

### III.    Plaintiff's Claim Against CCE is Barred by the District of Columbia's General Statute of Limitations

Even if Plaintiff were to have standing to assert a legally cognizable claim against CCE (and pleaded it adequately to survive a Rule 12(b)(6) dismissal), such a claim would still be barred under the District's general statute of limitations.  *See generally* D.C. Code § 12-301 (2004).  The statute limits the time for bringing actions on a simple contract (express or implied), or where a time limitation is not otherwise specified, to three years from the time when a right to bring the action begins.  D.C. Code § 12-301(8) (2004).  Plaintiff does not dispute the statute, limitations period, or its applicability to any claims he asserts against CCE and other defendants.

Plaintiff tries to avoid the obvious limitations problem by arguing that the statute of limitations ought to have been tolled "because of CCE's deceptive and fraudulent conduct which operated to suppress from the Plaintiff the effect of CCE's actions and the actions of the District of Columbia Government...."  *See* Opposition at 15.[2]  This argument is wholly without merit and is, at best, disingenuous.

Plaintiff's assertion that CCE "fraudulently concealed" its role in advising the D.C. Council regarding legislation that later became the Office of Administrative Hearings Establishment Act of 2001 is belied by the legislative history of that law.  Exhibit A reflects

---

[2]    Plaintiff also contends that the three year statute of limitations should be considered tolled during the two years that Plaintiff was incarcerated, from April 2004-April 2006.  However, even using the latest possible date from which to compute the limitations period (March 6, 2002, the date the Office of Administrative Hearings Establishment Act of 2001 was enacted) the limitations period in which Plaintiff had to bring any claim against CCE would have expired in March 2007—approximately one year before the instant suit was filed.

that CCE publicly presented its report and recommendations to the D.C. Council at a public

hearing held on May 23, 2001. *See* Ex. A at 12-14. The legislative history conclusively

demonstrates that Plaintiff not only attended that May 23, 2001 hearing and heard CCE's

presentation, but in fact presented his own opposing views at that same hearing and raised his

perceived concerns about CCE's involvement and alleged conflict of interest. Indeed, the

legislative history records Plaintiff's testimony at that public hearing as follows:

> Dr. Banks testified in opposition to requiring attorneys who appear
> before the Office of Administrative Hearings to be members of the
> D.C. Bar. He stated that the Council should be mindful of the
> origins and the interests that are behind the proposed legislation,
> including the Council for Court Excellence. Dr. Banks testified
> that in his opinion the Council for Court Excellence has a conflict
> of interest in developing this legislation, and raised concerns
> expressed by council members during the last Council period.

*See* Ex. A at pg. 23. Plaintiff was fully aware of CCE's role and its advice to the D.C. Council

in 2001. Plaintiff was fully aware that any claim he had against CCE (if one ever existed in the

first instance) could and should have been brought within the limitations period. None was.

The instant lawsuit is not only untimely, but also manifestly misrepresents material facts with

regard to Plaintiff's putative claims.

**IV.    The D.C. Council's Delegation of Authority to Recommend Reforms in the
District's Administrative Hearing System Immunizes CCE From Suit.**

The functions that CCE performed pursuant its contract with the D.C. Government are

functions that governmental employees would perform had the government not contracted

them out. Courts have held that when a private party defendant acts in accordance with the

duties imposed by a contract with a governmental body, performs a governmental function, and

is sued solely on the basis of those acts performed pursuant to contract, qualified immunity is

proper. *See, e.g., DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 722

(10th Cir. 1988); *Kauffman v. Anglo-American School of Sofia*, 28 F.3d 1223, 1226 (D.C. Cir. 1994) (school established to provide elementary level instruction to children of American and British diplomats stationed in Bulgaria was immune from *Bivens* liability). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As Plaintiff's claims against CCE do not set forth any cognizable claim or valid allegation that CCE violated any law, CCE is additionally entitled to a summary dismissal on immunity grounds.

## CONCLUSION

CCE's report and recommendations to the D.C. Council regarding the Office of

Administrative Hearings Establishment Act of 2001 were lawful, transparent, and entirely

appropriate.  Mr. Banks may have disagreed with CCE's analysis and the D.C. Council's

decision to modify the administrative adjudicatory procedures in the District, but he had an

opportunity to voice those concerns prior to the enactment of the legislation.  Indeed, he

exercised his rights and availed himself of that opportunity, as reflected in the legislative

history record.  Now, seven years later, Mr. Banks has filed a baseless lawsuit against judges,

the Attorney General of the United States, CCE, and others to reiterate the same (baseless)

arguments and invective he has advanced in hearings and countless other lawsuits.   The

lawsuit against CCE has absolutely no merit and should be dismissed with prejudice.

Dated:  June 19, 2008                          Respectfully submitted,

                                                ARENT FOX PLLC


                                                 /s/ James H. Hulme
                                                James H. Hulme (#323014)
                                                Matthew M. Wright (#474731)
                                                Kavitha J. Babu (#491067)
                                                1050 Connecticut Ave, N.W.
                                                Washington, D.C. 20036-5339
                                                (202) 857-6000/Telephone
                                                (202) 857-6395/Facsimile

                                                *Attorneys for Defendant Council for Court
                                                Excellence*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of June 2008, I caused a copy of the foregoing Defendant Council for Court Excellence's Reply in Support of Motion to Dismiss Plaintiff's Complaint with Prejudice to be served by U.S. Mail, first-class postage pre-paid, upon the following:

Mr. Simon Banks
P.O. Box 17052
Alexandria, VA 22302

Hon. Nöel Anketell Kramer
D.C. Court of Appeals
500 Indiana Avenue, N.W.
Washington, D.C. 20001

Hon. Annice Wagner
D.C. Court of Appeals
500 Indiana Avenue, N.W.
Washington, D.C. 20001

Hon. John Ferren
D.C. Court of Appeals
500 Indiana Avenue, N.W.
Washington, D.C. 20001

Mr. Garland Pinkston
Clerk of the Court
D.C. Court of Appeals
500 Indiana Avenue, N.W.
Washington, D.C. 20001

Mr. Peter Nickles
Interim Attorney General of D.C.
441 4th Street, N.W.
Suite 1060N
Washington, D.C. 20001

District of Columbia Government
Mayor Adrian Fenty
441 4th Street, N.W.
Suite 1060N
Washington, D.C. 20001

Hon. Michael B. Mukasey
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

                                             _/s/ James H. Hulme_____
                                             James H. Hulme

# Council of the District of Columbia
# Report

441 4th St., N.W.  Washington, D.C.  20001

To:            All Councilmembers

From:        Kathy Patterson, Chairperson, Committee on the Judiciary

Date:        September 25, 2001

Subject:    Bill 14-208, the "Office of Administrative Hearings Establishment Act of 2001"

The Committee on the Judiciary, to which Bill 14-208, the "Office of Administrative Hearings Establishment Act of 2001," was referred, reports favorably on the legislation and recommends adoption by the Council of the District of Columbia.

## **PURPOSE AND EFFECT**

Bill 14-208, the "Office of Administrative Hearings Establishment Act of 2001", creates an independent agency to adjudicate administrative disputes and centralizes the hearing functions currently handled by a variety of District agencies.

The concept of the central hearing agency that has been incorporated in Bill 14-208 follows several years of discussion and study regarding reform of the administrative process. Former Corporation Counsel Charles Ruff initially requested the Council for Court Excellence conduct a study of the issue, and Judge John Ferren continued to focus attention on this important project in his tenure as Corporation Counsel.  In an October 20, 1998 memorandum to former Chief Management Officer Camille Cates Barnett, Mr. Ferren wrote that the ultimate goal of the central hearing agency is "to improve the integrity and quality of justice citizens receive through administrative adjudications in the District of Columbia."  The benefit to the government, he wrote, would be "more consistent decisions, improved professional standards and operating efficiencies, and a higher level of customer satisfaction.  Benefits to citizens and businesses include:  perception of a fair and impartial, legitimate process for resolving administrative disputes; more timely and efficient disposition of cases; and a more professional, detached cadre of hearing officers."  (Attachment D).

In September of 1999, after completing a comprehensive review of national best practices, the Council for Court Excellence issued a series of recommendations to reform the administrative hearing system in the District.  The Council for Court Excellence Report concluded that "the District of Columbia could potentially benefit greatly from implementing a centralized

1

administrative hearing system to adjudicate most citizen, employee, and business disputes with agencies of the D.C. Government. . . The Central Hearing Panel Model now at work in over twenty states and two major American cities has been demonstrated to provide better, faster, and a more independent adjudicatory process than what we now have in the District of Columbia." (Attachment E).

Bill 14-208 builds on Bill 13-865 as introduced by Chairman Cropp at the request of the Mayor during the last Council period, and incorporates many aspects of Bill 14-219 that was also proposed by the Williams Administration and introduced in May of this year. The Committee Print of this legislation reflects a consensus achieved between Councilmember Patterson, the author of Bill 14-208, and the Williams Administration, following a series of discussions that also included the Council for Court Excellence. Most notably, the scope of the bill has increased from the version that was introduced last year, so that the Office of Administrative Hearings will incorporate hearings currently handled by the Department of Employment Services, Department of Consumer and Regulatory Affairs, Office of Banking and Financial Institutions, Department of Insurance and Securities Regulation, and the Taxicab Commission, as well as tax cases handled by the Office of Tax and Revenue, licensing and enforcement matters handled by the Child and Family Services Agency, litter control and illegal dumping cases, and special education cases handled by the D.C. Public Schools. Bill 14-208, similar to Bill 13-865, also applies to the Department of Health, Department of Human Services, and Board of Appeals and Review as provided in earlier proposals. The Committee Print provides a phase-in period for agency inclusion into the new Office, with the majority of agencies subject to the act on October 1, 2003, and the Department of Employment Services, D.C. Public Schools, and Taxicab Commission subject to the act on October 1, 2004.

At the suggestion of the Williams Administration, the Committee Print has incorporated a Commission on Selection and Tenure of Administrative Law Judges. This concept was developed in response to concerns expressed by Councilmembers last year, and significantly alters the selection process for Administrative Law Judges. The Commission is composed of representatives from each of the three branches of government, and the Commission, rather than the Chief Administrative Law Judge, will be responsible for the selection, reappointment, and discipline of Administrative Law Judges.

The basic structure of Bill 14-208 is substantially the same as earlier legislative proposals, and the bill provides for the establishment of the Office, as well as the agency's jurisdiction and structure. The bill defines the powers and duties of the Chief Administrative Law Judge, who directs the Office, and the Administrative Law Judges who will be presiding over cases. In addition, the legislation establishes the position of Executive Director for the Office, establishes procedures for judicial and agency review of decisions, establishes an external Advisory Committee for the Office, and provides necessary conforming amendments.

## LEGISLATIVE HISTORY

| DATE | ACTION |
|---|---|
| October 5, 2000 | Introduction of Bill 13-865, the "Office of Administrative Trials and Hearings Act of 2000" by Chairman Cropp, at the request of the Mayor. |
| October 17, 2000 | Referral of Bill 13-865 to the Committee on the Judiciary with comments from the Committee on Government Operations. |
| October 30, 2000 | Public Roundtable on Bill 13-865 held by the Committee on the Judiciary. |
| December 1, 2000 | Committee on Government Operations submits Comments on Bill 13-865. (Attachment F). |
| December 4, 2000 | Consideration and vote on Bill 13-865 by the Committee on the Judiciary. |
| December 5, 2000 | Bill 13-865 withdrawn from consideration before the Council during the Legislative Meeting. |
| May 1, 2001 | Introduction of Bill 14-208, the "Office of Administrative Trials and Hearings Establishment Act of 2001", by Councilmember Patterson, and co-sponsored by Councilmember Ambrose. (Attachment A) |
| May 2, 2001 | Referral of Bill 14-208 to the Committee on the Judiciary. |
| May 11, 2001 | Notice of introduction of Bill 14-208 published in the D.C. Register. |
| May 15, 2001 | Introduction of Bill 14-219, the "Office of Administrative Hearings Establishment Act of 2001, by Chairman Cropp, at the request of the Mayor. (Attachment B) |
| May 16, 2001 | Referral of Bill 14-219 to the Committee on the Judiciary. |
| May 18, 2001 | Notice of Public Oversight Hearing on Bill 14-208 published in the D.C. Register. (Attachment C) |
| May 23, 2001 | Public Oversight Hearing on Bill 14-208, the "Office of Administrative Trials and Hearings Establishment Act of 2001". The Committee also discussed and considered Bill 14-219, the "Office of Administrative Hearings Establishment Act of 2001" during the Public Oversight Hearing. |
| September 25, 2001 | Consideration and vote on Bill 14-208 by the Committee on the Judiciary. |

## IMPACT ON EXISTING LAW

Bill 14-208 will establish an Office of Administrative Hearings to adjudicate administrative disputes with the District Government. No agency of the District to which this act applies shall, after the Office of Administrative Hearings begins accepting cases for adjudication, employ hearing officers, either full or part-time, to adjudicate contested cases. Any statutes or regulations that grant such authority to District agencies other than the Office of Administrative Hearings shall be superseded.

Conflicts of Regulations:

Unless a federal law or regulation or District statute requires that a particular federal or District procedure shall be observed, this act and the rules promulgated pursuant to this act shall take precedence in the event of a conflict with other authority with regard to any issue involving or relating to procedures of this Office.

Conforming Amendments:

The District of Columbia Government Comprehensive Merit  Personnel Act of 1978 and the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985 shall be amended consistent with section 20 of the Committee Print.

## SECTION-BY-SECTION ANALYSIS

Section 1 states the long and short titles of Bill 14-208.

Section 2 states the purpose of the act as establishing the Office of Administrative Hearings as an administrative tribunal to provide access to a high quality, fair, impartial, and efficient system of adjudication.

Section 3 sets forth the findings in support of the legislation. Under this section, the Council finds that: (a) There is a need to modernize and improve administrative adjudication in the District;  (b) Adjudication in the District suffers from hearing examiners who lack the qualifications to fairly and properly adjudicate cases;  (c) Hearing officers employed by the agency responsible for enforcement of the law are perceived to have a bias in favor of that agency;  (d) A unified administrative hearing office would eliminate potential conflicts of interest of administrative law judges, promote due process, provide consistency and efficiency, increase the professional qualifications of administrative law judges, and expedite the fair and just conclusion of contested cases;  (e) Cost effectiveness of administrative adjudication can be substantially improved through the establishment of a unified, impartial, and properly managed administrative hearing office.

4

Section 4 provides definitions of terms that are used throughout the act, many of which are incorporated from the Administrative Procedure Act.

Section 5 establishes the Office of Administrative Hearings as an independent agency within the executive branch of the District government. The Office will be subject to the Procurement Practices Act, the Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Act, the Office of the Chief Technology Officer Establishment Act, and the Office of Property Management Establishment Act. In addition, this section provides that no person outside the Office of Administrative Hearings may interfere with the decisional independence of the Office or with the outcome of a particular case.

Section 6 establishes the Commission on Selection and Tenure of Administrative Law Judges. The purpose of the commission is to recruit and retain well-qualified, efficient, and effective Administrative Law Judges.

The commission will consist of three voting members and two non-voting members. The voting members will serve staggered terms, with one member appointed by the Mayor, one member appointed by the Chairman of the Council, with the approval of a majority of the Council, and one member appointed by the Chief Judge of the Superior Court. The Corporation Counsel or his or her designee within the Senior Executive Attorney Service and the Chief Administrative Law Judge will be non-voting members of the commission. The members of the commission will not be compensated, but may receive reimbursement of reasonable expenses. Members will be appointed for three year terms, after an initial start-up period to phase-in the staggered term structure, and will be eligible for reappointment.

The Mayor shall promulgate initial rules governing the appointment, reappointment, discipline, removal and qualifications of Administrative Law Judges within 180 days of the effective date of the act.

Section 7 states the jurisdiction of the Office, identifies the agencies to which the act applies, and provides a timeline for agency inclusion within the Office.

On October 1, 2003, the act will apply to the Department of Health, Department of Human Services, Board of Appeals and Review; Department of Consumer and Regulatory Affairs, Office of Banking and Financial Institutions, and Department of Insurance and Securities Regulation, as well as licensing and enforcement matters arising under rules issued by the Child and Family Services Agency, litter control and illegal dumping cases, and tax cases heard by the Office of Tax and Revenue. As of October 1, 2004, the act will also apply to the Department of Employment Services, special education cases heard by the D.C. Public Schools, and the Taxicab Commission. By October 1, 2002, the Mayor is required to report to the Council the results of a study regarding methods to improve the quality of adjudications within the Bureau of Traffic Adjudication at the Department of Motor Vehicles.

Those agencies that are not included in Bill 14-208 may refer individual cases to the Office of Administrative Hearings, with the approval of the Chief Administrative Law Judge, or elect, with approval by the Mayor, to be covered by this act. The Mayor may temporarily exempt an agency or class of cases from inclusion in the Office for a period of one year following the effective date of the act. If an agency is exempted under this provision, the Mayor is required to submit a report to the Council explaining the rational for such an exemption within 30 days. No additional rights to a hearing are created by this act, except with regard to discipline or removal of the Chief or other Administrative Law Judge. Agencies may not employ hearing officers to adjudicate cases after the Office begins accepting cases, but nothing in the act prevents an agency head or other principal, on a non-delegable basis, to adjudicate cases in their jurisdiction in lieu of the Office. A special rule exists for cases that involve an agency in receivership.

Section 8 creates the position of the Chief Administrative Law Judge (Chief ALJ), who will be responsible for the fairness, impartiality, effectiveness and efficiency of the Office.

The Chief ALJ will be appointed by the Mayor, with the advice and consent of the Council, to a six-year term with a maximum of two terms. The Chief ALJ cannot be removed from office, except upon a written finding of just cause by the Mayor, subject to the right of appeal. After completing his or her term, the Chief ALJ may serve as a Senior Administrative Law Judge in the Office, unless there was cause for his or her removal.

The Chief ALJ must be a member in good standing of the D.C. Bar at the time he or she assumes office, and must be a resident of the District within 180 days of taking office. The Chief ALJ is required to devote full time to the duties of the Office and is prohibited from other practice of law that is inconsistent with his duties.

The Chief ALJ will be appointed to the Excepted Service, and will be compensated at the Grade 18 level, Step 5, of the Mayor's Excepted Service Schedule.

Section 9 describes the powers and duties of the Chief ALJ. According to section 9(a), the Chief is required to supervise the Office of Administrative Hearings, assign Administrative Law Judges to preside over cases, establish training programs, appoint and discipline the staff employed by the Office other than Administrative Law Judges, provide for continuing education programs, develop and implement rules of procedure, monitor the quality of administrative adjudication, develop and implement a code of professional responsibility, develop and implement annual performance standards, apply a pay scale designed to attract highly capable public and private sector attorneys to become Administrative Law Judges, and transmit to the Mayor and the Council an annual report on the operations of the Office. Section 9 also provides the Chief ALJ with discretionary authority to undertake various activities that will assist in the fair, efficient, and timely administration of the Office's adjudication activities.

Section 10 states the qualifications and terms of employment for Administrative Law Judges. As described in section 6, Administrative Law Judges shall be appointed upon the

6

affirmative vote of a majority of the voting members of the Commission on Selection and Tenure after a selection process in accordance with rules promulgated by the Mayor. Administrative Law Judges (ALJs) will be required to take an oath of office, be a member of the D.C. Bar, meet residency requirements as described in the Comprehensive Merit Personnel Act, and have at least five years experience in the practice of law, including litigation. ALJs will also be required to meet other appropriate qualifications, such as the possession of judicial temperament, expertise, experience and analytical and other skills necessary and desirable for an Administrative Law Judge.

An ALJ will be appointed to the excepted service for an initial term of two years, at the end of which he or she will be eligible for reappointment to a term of 10 years. District government employees who are employed by an agency that is subject to this act are eligible to be appointed as ALJs. No hearing officer will be required to accept an appointment as an ALJ, and those who are not appointed or are ineligible to be appointed, will be reassigned to another position within the District government. ALJs will be subject to discipline and removal, only for cause, with a right to notice and a hearing before the Commission on Selection and Tenure pursuant to rules issued by the Mayor under section 6. Compensation of ALJs shall not exceed the compensation level available to attorneys of the Senior Executive Attorney Service.

Section 11 describes the powers and duties of Administrative Law Judges. This section requires ALJs to meet applicable performance standards and to participate in orientation and continuing legal education programs. ALJs are expected to fully participate in the management activities of the Office, and they are prohibited from engaging in any conduct that is inconsistent with the duties and responsibilities and ethical obligations of their position. Section 11 also grants ALJs the necessary authority to conduct hearings effectively by allowing them to issue subpoenas, administer oaths, impose monetary sanctions for failure to comply with orders, and exercise other related adjudicatory authority. Upon proper application, a judge of the Superior Court may also hold a party in civil contempt for refusal to comply with a lawful order of an ALJ.

Section 12 provides for an Executive Director of the Office, with responsibility for the administration of the Office, who reports to the Chief ALJ. The Executive Director is not required to be an attorney, and is prohibited from being an ALJ within the Office. The Executive Director may not supervise ALJs, but may, with the approval of the Chief ALJ, appoint and fix the salary of other employees of the Office.

Section 13 provides for the cooperation between the Office and all other components of the District government. It also requires the Chief ALJ to transmit to the Mayor, the Council, and each agency to which the act applies, a written summary of the Office's caseload during the previous fiscal year that is attributable to any provision of law administered by or under the jurisdiction of each such agency. Each agency to which the act applies shall provide a written response to the Mayor, the Council and the Office regarding whether there is reason to expect that the caseload will increase or decrease by more than 10% in the current or following fiscal year.

Section 14 addresses the representation of parties in adjudicated cases before the Office. Nothing in this section prevents an individual from representing himself or herself before the Office, but this section does require the Office to promulgate rules to regulate the attorneys who appear before it.

Section 15 provides that the act and rules promulgated pursuant to it shall take precedence over any conflicting authority, unless federal law or regulation or a District statute requires otherwise.

Section 16 provides that judicial review of all orders of the Office in contested cases shall be in the District of Columbia Court of Appeals. Judicial review of any order of the Office in a matter that is not a contested case shall be in accordance with other applicable law.

Section 17 establishes an Advisory Committee for the Office, consisting of the Mayor or his designee, the Chairman of the Council or her designee, the Corporation Counsel or his designee, two agency heads appointed by the Mayor or their designees, two members of the D.C. Bar, appointed by the Mayor, and a member of the public, appointed by the Mayor. The Advisory Committee shall advise the Chief ALJ, identify issues important to the Office, review weaknesses, comment upon policies and regulations, and make recommendations for statutory and regulatory changes.

Section 18 pertains to issues that are relevant to implementation of the act. This section provides that the Mayor may issue an executive order to appoint an acting Chief ALJ, pending his or her confirmation, in order to plan for the commencement of operations on October 1, 2003. This section also provides for the transfer of all funding, property, and hiring authority from the agencies to which this act becomes applicable to the Office of Administrative Hearings.

Section 19 provides that there are authorized to be appropriated from the general and other revenues of the District funds necessary to carry out the purposes of this act.

Section 20 makes conforming amendments to the District of Columbia Government Comprehensive Merit Personnel Act and the Department of Consumer and Regulatory Affairs Civil Infractions Act.

Section 21 refers to the fiscal impact statement required by the District of Columbia Home Rule Act.

Section 22 provides the effective date of the act.

## COMMITTEE REASONING

The Committee made several changes to Bill 14-208 since the bill was introduced on May 1, 2001, and this section will explain the reasoning behind those changes that have been incorporated into the Committee Print.

First, in section 1, the Committee has changed the name of the bill to the "Office of Administrative Hearings Establishment Act of 2001". This change is consistent with the title of central hearing panels in other jurisdictions, as well as the title of Bill 14-219 as introduced by Chairman Cropp at the request of the Mayor.

Second, section 5 has been amended in order to clarify the applicability of existing laws to the Office, and to expressly prohibit any interference in the independence of the Office from any person outside the ordinary litigation process. The Office will be subject to the District of Columbia Procurement Practices Act, the Equal Opportunity for Local, Small and Disadvantaged Business Enterprises Act, the Office of the Chief Technology Officer Establishment Act, and the Office of Property Management Establishment Act.

Third, a new section 6 has been added to the Committee Print, and the existing sections have been renumbered appropriately. The new section 6 establishes a Commission on Selection and Tenure of Administrative Law Judges of the Office of Administrative Hearings, and was proposed by the Williams Administration in response to concerns raised by Councilmembers during the last Council period. In Bill 14-208 as introduced, Administrative Law Judges would have been appointed by the Chief ALJ, but Councilmembers expressed concern that this responsibility gave the Chief too much power. In the Committee Print, the Commission is composed of representatives from each of the three branches of government, and the Commission, rather than the Chief Administrative Law Judge, will be responsible for the selection, reappointment, and discipline of Administrative Law Judges.

Fourth, the most significant change that has been made to the Committee Print pertains to section 7, regarding the jurisdiction of the Office and agency authority to review cases. The Committee Print provides an inclusive list of 12 agencies and types of cases to be incorporated into the new Office of Administrative Hearings, whereas Bill 14-208 as introduced provided that the act applied to all District agencies with the exception of 20 agencies that were expressly exempted from the act. The Committee made this change in order to minimize confusion regarding the agencies that are covered under the act.

In addition, the scope of the Office has changed since the bill was introduced by omitting the Department of Motor Vehicles (DMV) from the list of agencies that are covered by the act. The Committee made this change because the Williams Administration expressed serious concerns that inclusion of the DMV would overwhelm the Office of Administrative Hearings. The Mayor's office noted that the Council for Court Excellence study found that DMV's annual caseload in 1998 involved the disposition of more than 200,000 cases, whereas the remainder of the agencies studied had a combined total caseload of less than 5,000 cases. Additionally, Margret Kellems, Deputy Mayor for Public Safety, testified that highly qualified attorneys could be deterred from

seeking a position as an Administrative Law Judge if a large percentage of their caseload would be comprised of motor vehicle adjudications. Chief Judge Hardwicke, Chief Administrative Law Judge with Maryland's Office of Administrative Hearings, also testified in opposition to the inclusion of DMV in the bill, and his testimony influenced the Committee's position on this issue.

The Committee notes that the high volume of cases could be used as a justification for including the DMV in the new central hearing panel, as an agency with a poor track record that affects the greatest number of District residents. The Committee Print provides, therefore, a requirement that the Mayor conduct a study to consider methods to improve the quality of adjudications within the Bureau of Traffic Adjudication at DMV, and submit a report to the Council by October 1, 2002.

Fifth, section 8 has been amended to provide that the Chief Administrative Law Judge shall be compensated at the Grade 18 level, Step 5, of the Mayor's Excepted Service Schedule. This change was made to provide greater specificity with respect to salary so that the Chief ALJ will not be required to negotiate on this issue with the Mayor. The current rate of pay for Grade 18, Step 5, of the Excepted Service is $121,067, and this amount is equivalent to 85% of the salary for judges at Superior Court. Section 8 has also been revised to provide the Chief ALJ the right to continue as a Senior Administrative Law Judge at the conclusion of his or her period of service. This change was made at the request of the Williams Administration, and is intended to make the Chief ALJ position more attractive to potential candidates.

Other minor or technical changes that have been made to the Committee Print since Bill 14-208 was introduced include:

1. The term "matter" has been replaced by the term "adjudicated cases" or "cases" throughout the majority of the bill. Likewise, the definition of "matter" has been replaced by the definition of "adjudicated case."

2. Citations to the D.C. Code have been amended to reflect the 2001 edition of the code rather than the earlier 1981 edition.

3. At the recommendation of the Williams Administration, section 7 has been amended to allow agencies that are not covered by the act to refer individual cases to the Office of Administrative Hearings, with the approval of the Chief ALJ.

4. The Mayor is required to submit a report to the Council to explain any exemptions made under section 7(e).

5. Sections 7(g), (h), and (i) have been added to clarify the duties of agencies and the new Office of Administrative Hearings in reviewing cases.

6. The powers and duties of the Chief Administrative Law Judge under section 9 and

Administrative Law Judges under section 10 have been revised to take into account the creation of the Commission on Selection and Tenure for Administrative Law Judges.

7. The Chief ALJ shall submit annual performance evaluations and case statistics to the Mayor and the Council as a component of the annual report that is required under section 9(a)(12).

8. Section 9(b)(2) has been amended to replace the term "contractual" with the term "reimbursable."

9. Sections 8(b)(8) and 9(g) of Bill 14-208 as introduced were omitted at the recommendation of the General Counsel's office in order to avoid a potential challenge to the appointment process on the grounds of an equal protection violation.

10. ALJs are required to have five years of experience practicing law, rather than four, and the initial term of an ALJ has been increased from one to two years under section 10.

11. Section 10(e) has been amended so that hearing examiners who are currently employed by District agencies, but are not appointed or are ineligible to be appointed as an Administrative Law Judge, will be reassigned to another position within the District government.

12. Section 16(b), pertaining to judicial review and administrative appeals, has been amended to take out any reference to the Board of Appeals and Review, but specifies that the Rental Housing Commission shall continue to have jurisdiction to review orders of the Office of Administrative Hearings.

13. Section 22, the provision that relates to the effective date of the act, has been amended to omit the requirement that the Financial Responsibility and Management Assistance Authority approve the legislation.

## FISCAL IMPACT

A copy of the fiscal impact statement that was prepared by the Chief Financial Officer during the last Council period is attached to the Committee Report. (Attachment G).

## PUBLIC HEARING

The Committee on the Judiciary held a public hearing on Bill 14-208 on May 23, 2001. The testimony of the witnesses appearing at the hearing is summarized below.

**1. Joseph Cooney, University Legal Services**

Mr. Cooney is a program manager of the Client Assistance Program (CAP), which is a division of University Legal Services. He testified that the administrative rules and regulations within the District of Columbia government are inadequate, and stressed the need for a broader regulatory reform in conjunction with the pending legislation. Mr. Cooney pointed out that the Rehabilitation Services Administration, D.C. Department of Human Services, is a particularly egregious example of an agency that has failed to implement necessary rules and regulations concerning the delivery of services. He notes that the proposed legislation "put the cart before the horse" by failing to adequately address these underlying problems with administrative law in the District.

## 2. Council for Court Excellence
**James P. Mercurio, Board of Directors, Council for Court Excellence**
**Samuel F. Harahan, Executive Director, Council for Court Excellence**

James Mercurio delivered a statement on behalf of the Council for Court Excellence, and Samuel Harahan, the Executive Director, testified in response to questions posed by Chairperson Patterson. The Council for Court Excellence (CCE) is a non-partisan civic organization that works to improve the administration of justice in the local and federal courts and related agencies in the District of Columbia. CCE has been involved with a number of reform efforts in the District government, and has frequently testified at Council hearings regarding legislation that is relevant to the mission of the organization. The District contracted with the Council for Court Excellence to conduct a comprehensive review of the current administrative hearings process, and to recommend ways to improve this process. In September 1999, CCE released its findings and recommendations, and issued the final report on "Creating a Unified Administrative Hearing Agency." CCE also attended a hearing that was held by Councilmember Brazil on October 30, 2000, and testified on an earlier version of the bill to create an Office of Administrative Hearings (OAH).

Mr. Mercurio noted that agency decisions have a "pervasive influence in our community" with over 200,000 administrative decision in 1998, as compared to 170,000 case dispositions in the same year by the D.C. Superior Court. He stated that "[i]t is important that the citizenry of the District of Columbia perceive that the administrative appeal process in disputes with their government are timely, fair, and impartial. However, with few exceptions, we found in our 1999 study of the District's administrative adjudicatory systems, that the perception is that when citizens and businesses have legal disputes with the D.C. Government, they cannot be certain they will receive prompt, efficient decisions that they see as fair."

Mr. Mercurio testified that Bill 14-208 made significant improvements from the legislation that was introduced to the Council last year. First, the Council for Court Excellence supports the broader scope of agencies covered in the more recent legislation, and Mr. Mercurio stated, "[p]roperly implemented, the comprehensive scope of the current bills better serves the constituency of citizens and businesses who presently suffer from the well-documented, long-standing ills of the District's disparate, fractured adjudicatory system." Second, Mr. Mercurio

12

testified that Bill 14-208 and Bill 14-219 have eliminated unnecessary levels of judicial review that the earlier version of the proposed legislation would have created.

Mr. Mercurio noted that the timing of the commencement of the new Office is one of the significant differences between Chairperson Patterson's bill, Bill 14-208, and the Williams Administration's bill, Bill 14-219. The Administration's bill would open the doors to the new agency on October 1, 2002, and would provide a three year phase-in period to incorporate agencies. In contrast, Chairperson Patterson's bill would not start operations until October 1, 2003, and it would start all at once by incorporating a broader number of agencies into the new administrative panel at the outset. With respect to the choice between these two methods, Mr. Mercurio testified that "[t]he experience of other state hearing agencies across the country suggests that the recruitment of high quality ALJs is facilitated by an agency that at its inception has a substantial and diverse caseload." Following the presentation of the written statement, Mr. Mercurio responded to Chairperson Patterson's questions on the issue of timing, and noted that there is a certain "critical mass" that is necessary for the new agency to get started. If the OAH only includes a very small number of agencies within its jurisdiction, then it won't be able to attract top quality Administrative Law Judges. He recommended that if the Council decides to implement a staggered implementation process, then the specifics of the plan to incorporate new agencies should be included in the legislation.

The Council for Court Excellence also raised two additional issues that should be considered by the Committee and the Administration as this legislation moves forward. First, Mr. Mercurio testified that there remain concerns with the judicial review section of the bill. Under current law, either the D.C. Court of Appeals or the D.C. Superior Court may hear an appeal in contested cases, depending on the nature of the case. In contrast, under Bill 14-208, all appeals from the Office of Administrative Hearings would be heard by the Court of Appeals. If the Council decided to eliminate appeals at the D.C. Superior Court, then this type of change would require an additional amendment to the D.C. Administrative Procedures Act. Mr. Mercurio recommended that the Council follow a general principle not to alter the existing procedural framework for administrative cases.

Finally, Mr. Mercurio stressed the importance of the selection of the first Chief Administrative Law Judge to head the new agency. He noted that other jurisdictions, including Maryland, "have benefitted from the selection - often from the private sector - of a Chief Administrative Law Judge who is well-experienced and independent. The success of the proposed D.C. OAH agency may be determined in large part by the character, competence, and credibility of its first Chief."

In response to a question posed by Chairperson Patterson, Sam Harahan stated that the Council for Court Excellence worked with the Office of Corporation Counsel on this project. The methods employed during the study were to collect data from the various District agencies, to conduct interviews with key personnel, and to visit other jurisdictions with central hearing panels, such as Maryland, New York City, and Chicago.

Mr. Harahan testified that traffic tickets are typically not included in the central hearing panel because the agencies are usually established on the state level. He noted that there is a very high volume of these cases, and the Council for Court Excellence struggled with the issue of whether hearing examiners in these cases need to have a law degree or not. They concluded that for the majority of agencies, a law degree is necessary to adjudicate cases, but cases arising at the Department of Motor Vehicles does not seem to require legal training.

Chairperson Patterson inquired as to the jurisdictions that the Council for Court Excellence considered to be models to emulate in developing an Office of Administrative Hearings. Mr. Mercurio noted that Maryland is one model, and Mr. Harahan mentioned that North Carolina is another. Mr. Harahan noted that Oregon is the most recent state to implement a centralized hearing panel, and that New York City has experience with an extremely high volume of administrative cases, similar to the District. Mr. Mercurio noted that New York is a good model to consider with respect to the effectiveness of its computerized case tracking system.

Chairperson Patterson asked the Council for Court Excellence what principles they used in generating recommendations regarding which District agencies should be incorporated into the new OAH, and which agencies should be excluded. Mr. Mercurio noted that this is a very difficult question to answer. Many agencies feel that their expertise is too complicated for anyone else to understand or learn. He doesn't know of any principled way to distinguish between agencies but suggested that some factors to be considered include whether there is a specialized bar or the area of law involves a highly specialized field or science.

Chairperson Patterson asked whether the Council for Court Excellence recommended including DCPS special education hearings into the new agency. Mr. Harahan responded that he believed that the schools were receptive to being included in OAH, and there is no empirical reason to exclude them.

### 3. Natalie Ludaway, Greater Washington Board of Trade

Mary Rudolph, Director of DC Government Affairs at the Greater Washington Board of Trade, testified on behalf of Natalie Ludaway. Ms. Ludaway testified during the last Council period in support of Bill 13-865, the earlier version of the bill to create an Office of Administrative Trials and Hearings.

Ms. Rudolph stated that the Board of Trade supports Bill 14-208 as an effort to decrease the delay and confusion in the District's regulatory process, and to increase public confidence in the impartiality and fairness of administrative adjudications. She testified that the Board is particularly supportive of the bill's incorporation of a broad range of D.C. agencies, including the Department of Employment Services and the Department of Consumer and Regulatory Affairs. Ms. Rudolph stated, "[d]elay and uncertainty in the adjudication of worker's compensation and unemployment compensation matters has a dramatically negative impact on the cost of being in business in the District of Columbia."

14

## 4. Williams Administration
### Margret Nedelkoff Kellems, Deputy Mayor for Public Safety and Justice

Deputy Mayor Kellems testified to the history of the efforts to reform the District's administrative adjudicatory process, and she described some of the similarities and differences between Bill 14-208 and Bill 14-219. Paul Klein, the Chief Administrative Law Judge with the Department of Health, was also available to answer questions posed by Chairperson Patterson.

Ms. Kellems noted that the proposed legislation will bring the District in line with about half the states and the cities of New York and Chicago, and that the goal of both Bill 14-208 and Bill 14-219 is to "create a high quality administrative hearing system that is fair, efficient, and impartial..." She described the urgent need for this type of reform, stating that existing problems with the administrative adjudications in the District include lengthy delays, insufficient decisions, inappropriate communications with hearing officers, ineffective enforcement, and unqualified hearing officers that lack impartiality from their employer agencies. Ms. Kellems testified that reform efforts to date have focused on establishing a pilot reform project at the Department of Health and developing a more inclusive legislative proposal designed to rectify many of the existing problems with the administrative hearings process.

Deputy Mayor Kellems noted that there are several noteworthy distinctions between Bill 14-208 and Bill 14-219. She pointed out that the most significant difference between the two bills involves the scope or jurisdiction of the new central hearing panel, and the timing for inclusion of existing agency hearing functions into the Office of Administrative Hearings. The Mayor's proposal, as written in Bill 14-219, provides for a "phase-in" approach that establishes the new agency in three phases. The first phase of the Mayor's bill would begin on October 1, 2002, and includes the Department of Health, Department of Human Services, Department of Consumer and Regulatory Affairs' Rental Housing Division, Board of Appeals and Review, and licensing and enforcement matters of the Child and Family Services Agency. The second phase provides that three additional agencies will be included in the new administrative panel within the first 36 months of operation, including the Office of Tax and Revenue, litter control and illegal dumping cases brought by the Department of Public Works' Office of Public Space Administration (and currently heard by the Department of Motor Vehicles), all non-rental housing cases heard by the Department of Consumer and Regulatory Affairs. The third phase of the Mayor's proposed legislation allows for the addition of other agencies after the first 36 months. The Chief Administrative Law Judge is responsible under this plan to present recommendations to the Mayor and the Council regarding additional agencies to be incorporated into OAH.

In contrast to Bill 14-219, Bill 14-208 provides a "Day One" approach that would include all hearing functions from the beginning of the new agency, and presumptively includes all existing agency hearing functions unless an agency is specifically excluded from the bill. Ms. Kellems stated that the Williams Administration is supportive of the goal of inclusion of as many agencies as appropriate, but expressed concern that the Day One approach would prove to be unmanageable.

Ms. Kellems testified that the Administration agrees that adjudications at the Department of Motor Vehicles need to be improved, but opposed the proposal to include traffic and parking adjudications into the new OAH. She noted that there are hundreds of thousands of these cases heard on annual basis, and stated that "[t]he burden of tracking this high volume of cases and keeping them moving through the system is likely to overwhelm the new agency, resulting in delays and mismanagement not only of the motor vehicle cases, but also of the other matters within the agency's jurisdiction..." Additionally, Ms. Kellems expressed concern that highly qualified attorneys would be deterred from seeking a position as an Administrative Law Judge if a large percentage of their caseload would be comprised of motor vehicle adjudications.

Under Bill 14-208, the special education cases at D.C. Public Schools and hearings performed by the Department of Employment Services would be transferred to the new central hearing panel on October 1, 2003, at the outset of the new agency. Ms. Kellems testified to potential problems with incorporating these cases into OAH.

Another difference between Bill 14-208 and Bill 14-219 pertains to the salary of the Chief ALJ. Under Bill 14-208, the Chief's salary is tied to the Mayor's cabinet, whereas Bill 14-219 ties the Chief's salary to 80% of the D.C. Superior Court. Deputy Mayor Kellems testified that Bill 14-219 sets a fixed salary for the Chief so that he/she will not be required to negotiate with the Mayor regarding salary. The Administration also supports a provision to guarantee that the Chief shall have the right to assume a position as an Administrative Law Judge after completing a minimum term of service. Bill 14-208 does not include such a provision, whereas Bill 14-219 specifies that the Chief shall have this right. Ms. Kellems stated that the rationale behind this policy is to make the Chief ALJ position "far more attractive to a highly qualified senior attorney who would like to make a permanent transition to public service."

Ms. Kellems summarized several additional differences between Bill 14-208 and Bill 14-219. First, Bill 14-219 creates a Commission with representatives from the Executive, Legislative, and Judicial branches to assume responsibility for appointment, discipline and removal of Administrative Law Judges. The Commission concept was developed in order to address the concern of several Councilmembers that the Chief ALJ had too much power under an earlier version of the bill. Second, the Administration supports including provisions that allow agency heads to hear cases and consider appeals, whereas Bill 14-208 excludes these provisions. Third, the Mayor's bill allows the Chief ALJ to use temporary contractors or require enforcement agencies to pay for unexpected increases in caseloads. Finally, Bill 14-219 includes provisions regarding job protections for current hearing examiners that Bill 14-208 omits.

At the conclusion of Ms. Kellems' prepared statement, Chairperson Patterson noted that she was disappointed that the written testimony departed in tone and substance from the discussion that took place at a meeting with the City Administrator the week before. At the earlier meeting, the Administration made clear that a number of agencies would be included in the new Office of Administrative Hearings, including the Department of Consumer and Regulatory Affairs, Department of Employment Services, and D.C. Public Schools special education cases. Ms.

16

Kellems stated in response that her written testimony was only intended to describe the differences between the two bills as written, and did not reflect the subsequent commitment to broaden the scope of agencies covered by the bill.  She noted that the Administration remained very willing to follow through on this commitment.

Chairperson Patterson asked Deputy Mayor Kellems to comment on the earlier testimony of Joseph Cooney regarding gaps in underlying administrative rules and regulations, particularly with respect to the Rehabilitation Services Administration.  Ms. Kellems stated that she had not previously been aware of this particular issue, but she would be happy to look into ways to fill these gaps.

Chairperson Patterson asked whether the Administration had a proposal regarding traffic adjudication cases that are currently a responsibility of the Department of Motor Vehicles (DMV).  Ms. Kellems responded that this is the issue that touches the most residents, and therefore the Administration agrees that we need a focused effort to look at methods to reform the hearing process at DMV.

In response to a question posed by Chairperson Patterson, Ms. Kellems noted that the Office of the Corporation Counsel is examining the issue of potential legal impediments to including special education cases into OAH.  She expressed a need for further information on this point.

Chairperson Patterson asked Ms. Kellems to explain the rationale behind the policy decision to phase-in new agencies over a period of several years.  Ms. Kellems responded that the Administration did not want to overwhelm the new agency at the outset, and that resources were also a factor in the Mayor's proposal.  Paul Klein, the Chief Administrative Law Judge with the Department of Health, added that the Mayor excluded any agencies that were under a court order.

Chairperson Patterson asked for an explanation for the Mayor's proposal to give the Chief ALJ a right to become a Senior ALJ for a 10 year term at the conclusion of his or her term as Chief. Ms. Kellems stated that this provision is designed to assure potential applicants for the Chief's position that they won't need to return to the private sector after completing their term as Chief. Paul Klein noted that salary is not the first question that applicants ask with respect to this position.  The first question is about the nature of the work, and what type of cases they will be asked to handle.

Chairperson Patterson noted that the Mayor's bill provides that hearing officers currently employed by District agencies may apply to become Administrative Law Judges in the new OAH, but does not require them to accept such positions.  Section 10(e) states that "[a]ny hearing officer who is not appointed or is ineligible to be appointed as an Administrative Law Judge shall be reassigned, without reduction in grade or step, to another position within the agency employing that individual, or by the Mayor to a position in another agency."  Margret Kellems explained that there are many people who have been in these hearing examiner positions for a long time, and have provided good service to the District.  The Administration does not want to

17

penalize those people who don't meet the higher standards required by the proposed legislation. Paul Klein added that the Administration expects that this provision will only affect a few people, and noted that it should not be difficult to find alternative positions for those hearing examiners who are affected because of the relatively large number of Agency vacancies.

Chairperson Patterson noted that the Mayor's bill provides that ALJs may be furnished "on a reimbursable basis" to government entities not covered by the Act. Similarly, Bill 14-208 provides that ALJs may be furnished "on a contractual basis" to District agencies not required to use their services. Chairperson Patterson asked whether there was any meaningful difference between these two provisions, and Paul Klein responded that the government can't contract with itself so the language in Bill 14-219 is technically more correct.

Chairperson Patterson asked whether the Administration had an opinion on whether or not the Board of Real Property Assessment should be included in the new central panel, but Ms. Kellems responded that she did not have an opinion on this issue. Chairperson Patterson requested that the Administration consider the issue and develop an opinion on whether the Board should become a part of OAH.

Chairperson Patterson inquired about the rationale behind the Commission on Selection and Tenure of Administrative Law Judges, and Ms. Kellems stated that this provision was intended to respond to the loud and overwhelming concerns of Councilmembers that were expressed during the last Council period with respect to the need to spread out some of the responsibilities of the Chief ALJ. Paul Klein noted that there is nothing exactly like the Commission in any other jurisdiction. Chairman Cropp, Councilmember Brazil, and Councilmember Graham have expressed support for the Commission to hire and fire ALJs.

## 5. Administrative Law Judges Panel
**Chief Judge Julian Mann, North Carolina Office of Administrative Hearings**
**Chief Judge John Hardwicke, Maryland Office of Administrative Hearings**

Judge Mann and Judge Hardwicke testified about their experiences as Chief Administrative Law Judges in their respective states and their opinions regarding Bill 14-208 and Bill 14-219, but they did not submit written statements for the record. Judge Mann is the Chief Administrative Law Judge and Director of the Office of Administrative Hearings in North Carolina, and Judge Hardwicke is the Chief Administrative Law Judge of the Office of Administrative Hearings in Maryland. Judge Mann is the former president of the National Association of Administrative Law Judges, and Judge Hardwicke is currently the vice chairman of the Administrative Law Conference of the American Bar Association's Judicial Division.

Judge Mann offered his support for the efforts to create an Office of Administrative Hearings in the District of Columbia, as described in the legislative proposals before the Committee. Judge Mann noted that he would not comment on the particularities of the two bills because of his lack of familiarity with the local administrative law system in D.C. In his experience, each state is

unique, and the politics and the setting that drive the creation of the central hearing panel is different in each state.

Judge Mann stated that he agreed that the purposes identified in both bills, to promote "fairness, efficiency, and expertise," are the right goals to pursue with the new Office of Administrative Hearings. He urged the Committee that one of the most important aspects to achieving a successful reform of the administrative hearing process is to ensure the independence of the Administrative Law Judges. He stated, "[t]he one thing that I would say, generally, that the central panel offers, and that should be protected at all costs, is its independence, and its independent decisionmaking by the Administrative Law Judges. If that is not written into the legislation, and guarded by the Chief Judge, then those that appear in administrative litigation not only lose confidence in the adjudication, but confidence in government."

Judge Mann noted that there appeared to be a broad consensus in D.C. that is unusual in other states regarding the establishment of the central panel. He expressed surprise at the lack of resistance on the part of agencies that are being considered for inclusion in OAH, and described the District's focus on managerial concerns rather than political ones as unique.

Judge Mann described an article that he wrote regarding the efficiencies and economies of scale that he believes result from the creation of the central panel. He submitted the article, called "Striving for Efficiency in Administrative Litigation: North Carolina's Office of Administrative Hearings," to the Committee for review. Judge Mann also offered some advice to the new Chief Judge to pay particular attention to case management and case time dispositions, and described the need for computer systems that don't let cases fall through the cracks so that all cases are managed in an expeditious manner.

In Maryland, Judge Hardwicke testified that he has under his general responsibility the litigation from 23 different agencies, and 64 Administrative Law Judges, including himself. The Office of Administrative Hearings hears approximately 50,000 cases per year in all of Maryland's 23 counties, as well as the city of Baltimore. Judge Hardwicke noted that Maryland's Office of Administrative Hearings is not the oldest central hearing panel in the country, and California created the first such agency in 1946. The United States does not have a central hearing agency such as have been adopted in the states, and the federal government continues to have separate administrative hearings contained within each of the agencies.

Judge Hardwicke testified that there are two tragedies that could occur with respect to the proposed legislation to create an Office of Administrative Hearings. The first tragedy would be that no legislation is adopted, and the second tragedy would be to adopt legislation that contains within it an inherent failure.

Judge Hardwicke summarized that the major difference between Bill 14-208 and Bill 14-219 is the method of adopting agencies into the new hearing panel. The Mayor's bill provides a phase-in approach that would bring agencies into the new OAH over a three year period, starting on

October 1, 2002. Judge Hardwicke noted that this date is "probably the earliest practicable date in which this legislation could be initiated." In contrast, Bill 14-208 would bring almost all of the hearing functions into the central panel immediately on day one after a longer planning period.

Judge Hardwicke stated that, as of the date of the hearing, there were 25 states that have adopted central hearing agencies and two cities, including Chicago and New York.

In Maryland, the authorizing statute spells out a number of agencies that are not within the purview of the central panel, including the Public Service Commission, the Workers' Compensation Commission, and Unemployment Insurance cases. Unemployment Insurance was originally included within the jurisdiction of Maryland's OAH, but Judge Hardwicke recommended that the statute be amended in the second year of operation in order to exclude unemployment cases. Judge Hardwicke sought this legislative change because the unemployment cases were not handled efficiently and the work was not appropriate, in his opinion, for Administrative Law Judges because it did not permit any judicial discretion.

Judge Hardwicke distinguished between court cases that involve executive functions, such as the police powers, from administrative adjudications that involve agencies. He noted that the legislation that creates the central administrative hearing panel is not intended to create a new court system. Periodically, the Maryland legislature tries to get the Office of Administrative Hearings to decide traffic cases, although these cases are currently handled by the District Court. Judge Hardwicke opposes the incorporation of traffic adjudications into OAH because the sheer volume of cases would be unmanageable for the agency. Judge Hardwicke argued that "it is far better to leave the police function, to leave the direct governmental function, to the regular court system, or to some other method of adjudication." He also pointed out that Chicago is the only other central hearing panel that decides traffic cases, but he noted that the Chief Judge there assigns most of these cases to contract lawyers who sit on a part time basis.

Judge Hardwicke supported the concept of the phased-in approach for implementing the new central panel. He stated that "even though Maryland has a broad jurisdiction, we do not have all of the agencies [within OAH's purview], and we don't want all of the agencies."

In Maryland, the Chief Judge appoints all of the Administrative Law Judges within the Office of Administrative Hearings. Judge Hardwicke stressed that judges must be totally independent, well trained, and have a strong sense of ethics.

Judge Hardwicke agreed with the Council for Court Excellence testimony regarding the need to include a "critical mass" of judges and agency responsibilities in the new central panel from its inception, but he included a note of caution that at the other extreme the legislation must not overwhelm the new agency by putting in too many agencies at the beginning.

Judge Hardwicke concluded his prepared remarks by stating that the system of executive adjudication that we are considering is almost a contradiction in terms with respect to the concept

of separation of powers. The Office of Administrative Hearings appears to be a strange creature that does not fit neatly into one of the three branches of government, but it makes sense as it has evolved in other jurisdictions. Judge Hardwicke strongly endorsed the central administrative panel, and stated his belief that this movement "is probably the most important work in the field of law that has occurred in generations. What we're doing is that we are helping government agencies to get it right the first time."

Chairperson Patterson asked Judge Hardwicke why he believes that Unemployment Insurance and Workers' Compensation cases are inappropriate for incorporation in the central panel. He responded that unemployment cases involve citizen complaints regarding the amount of money that should be available under a benefits formula. This type of calculation is not appropriate work for a well-trained attorney. With respect to Workers' Compensation, Judge Hardwicke noted that in Maryland there is *de novo* review by the courts in these cases, and he doesn't want OAH's decisions to be reviewed from scratch in this manner. He stated that only two states include Workers' Compensation within their central panels, including Colorado and Minnesota. Judge Hardwicke expressed concern that Workers' Compensation tends to be highly politicized, and political-type decisions should not fall to the Office of Administrative Hearings.

Judge Mann expressed a slightly different perspective on this question than Judge Hardwicke. Judge Mann noted that what goes in to the central panel is somewhat driven by the property interests involved in the dispute. He stated that one must look at the traditions that are involved in different categories of cases in order to determine whether to include each type of case in a central agency. Traditionally, according to Judge Mann, Unemployment Insurance and Workers' Compensation cases have been separated into specialized adjudications, and the stakeholders involved are very protective of this process. Therefore, Judge Mann believes that tradition, as much as anything, dictates which agencies are incorporated and which agencies are excluded from central panels.

Chairperson Patterson noted that Judge Mann had stressed the importance of independence during his testimony, and she asked him what he meant by the term. Judge Mann responded that he was really talking about the need to protect the Administrative Law Judges from politics. Judge Hardwicke followed up on this point by emphasizing the importance of a good first Chief Judge.

With respect to the issue of appointment of judges, Judge Hardwicke stated that two bills in Maryland had been introduced to make all Administrative Law Judges gubernatorial appointments, but both of these bills ultimately failed. Judge Hardwicke noted that he did not oppose this type of policy change, and it would not bother him if the Governor wanted to make appointments in his place. He expressed support for the concept of the Commission on Selection and Tenure, and hypothesized that such a policy could minimize the political aspects of having the Governor or the Chief Administrative Law Judge make appointments. Judge Mann noted that in North Carolina the Chief Judge of the North Carolina Supreme Court appointed him as the Chief Administrative Law Judge, and the Chief ALJ appoints the other ALJs. He stated that he didn't

have any experience with a Commission like the one proposed in Bill 14-219, but he suspected that it could work.

Chairperson Patterson asked whether North Carolina and Maryland implemented their administrative panels all at once or phased-in new agencies over time. Judge Mann responded that North Carolina's central panel started all at one time, but noted that his state agency does not include jurisdiction over motor vehicle cases, which is an important factor to consider. Judge Hardwicke stated that Maryland's OAH has added work over time, as well as taken work away. He noted that there has been a strong push to add traffic cases, but they haven't added this responsibility. The Maryland central panel has added special education cases and child abuse and neglect cases, but only the new cases. Judge Hardwicke stated that the budget for Maryland's OAH is $10.75 million, and this is probably the largest budget for a central panel in the country with the exception of Arizona. Maryland may also have the greatest number of cases of any agency of this type in the country.

Chairperson Patterson asked how new cases were added, and who decided to make these types of policy changes. Judge Hardwicke stated that occasionally in Maryland the legislature decided, but sometimes the agency decided to send OAH cases they didn't want to handle any more. For example, the Board of Education asked OAH to hear cases pertaining to the closing of schools or the firing of teachers. In Judge Hardwicke's opinion, the "name of the game is to stay flexible."

Chairperson Patterson noted that the Maryland statute does not explicitly provide for a phase-in period and asked whether such a provision had been included in the law earlier, and then repealed. Judge Hardwicke responded that the Governor was able to exclude agencies for the first four years of the new central panel, but no agencies opted out. The Maryland OAH has its original jurisdiction minus Unemployment Insurance, with legislative and other additions.

Judge Mann noted that the North Carolina OAH is also the codifier of rules, and stressed the importance of the rulemaking function. Judge Hardwicke noted that it is rare for a central panel to have rulemaking authority, and he believes that it is inappropriate for a central panel to have this responsibility because they sit as judges in these cases. Only North Carolina and New Jersey have publication authority.

The Office of Administrative Hearings will need to develop rules of procedure. Additionally, Judge Hardwicke noted that Maryland rewrote its Administrative Procedure Act, and the District will need to do this as well. The American Bar Association is getting ready to make recommendations regarding necessary changes to the APA as a result of the implementation of central panels.

Chairperson Patterson asked, assuming the District decides to implement a phased-in approach, whether the Committee should fold troubled agencies in first or last. Judge Hardwicke responded that rather than trying to "oil the squeakiest wheels" first, the District should give to the new agency those things that it can do best and that are the easiest to assimilate. On the other hand, he

recommended that the Committee pay special attention to needy citizens and entitlement programs that are in need of reform. Judge Mann encouraged the Committee to consider the volume of cases that are involved in each agency, and advised against overwhelming the new agency with too many troubled agencies all at once. Chairperson Patterson noted that it is an attractive idea to fix what is most broken first.

With respect to a timeline for implementation, Judge Hardwicke explained that he received a call from the Governor on September 9, 1989, and the new agency was supposed to be up and running by January 1, 1990. Gradually, over a year, Judge Hardwicke moved the hearing examiners into a central location. Judge Mann noted that he was not the first Chief Judge, and therefore, he did not witness the start-up phase of the agency. He described the North Carolina OAH as having experienced a lot of turmoil during this period of time, and the state came very close to eliminating the agency in its early years.

Chairperson Patterson asked how Maryland and North Carolina handled the transition of existing hearing examiners into the new office. Judge Hardwicke stated that there were 90 hearing examiners hearing these administrative cases when he started as Chief Judge, and he hired 72 of them as Administrative Law Judges in the new agency. He noted that the legislature requested that he hire as many of the existing hearing examiners as possible rather than put any of them out of work. In attempting to fulfill this request, Judge Hardwicke picked up some former hearing examiners who were non-lawyers. He stated that the Office gradually improved and upgraded to higher standards, and two of the hearing examiners even attended law school at night in order to meet the new qualifications. The statute in Maryland does not require ALJs to be attorneys, but Judge Hardwicke requires applicants to be lawyers with five years experience by rule. Judge Hardwicke stated that other selection criteria include the quality of written work and character traits, such as a sense of fairness, as evidence by an oral exam or interview. Judge Mann stated that in North Carolina the statute requires all ALJs to be licensed to practice in the state.

## 6. Dr. Simon Banks, Job Protectors

Dr. Banks testified in opposition to requiring attorneys who appear before the Office of Administrative Hearings to be members of the D.C. Bar. He stated that the Council should be mindful of the origins and the interests that are behind the proposed legislation, including the Council for Court Excellence. Dr. Banks testified that in his opinion the Council for Court Excellence has a conflict of interest in developing this legislation, and raised concerns expressed by councilmembers during the last Council period.

## 7. David Conn, Tenant Action Network

David Conn provided a detailed description of the current process of tenant/housing provider litigation and adjudication at the Office of Adjudication within the Department of Consumer and

Regulatory Affairs. Mr. Conn testified that tenants have found the administrative review in these cases to be unsatisfactory, and noted that "hearing examiners fail to understand the law, weigh the evidence, and even keep a complete record for appellate review." In addition to these problems, Mr. Conn stated that hearing examiners at DCRA are biased in favor of landlords, and "[o]ften, recommended Decisions and Orders submitted by housing providers are printed out verbatim, spelling mistakes, grammatical errors, and all."

Mr. Conn concluded that the Tenant Action Network supports the concept of an independent, central hearing agency, and encouraged the Committee to include the Department of Consumer and Regulatory Affairs in the first phase of agencies to become a part of the Office.

## COMMITTEE ACTION

The Committee on the Judiciary met on September 25, 2001, to consider and mark-up Bill 14-208. Present and voting were Councilmembers Patterson, Ambrose, Brazil, Chavous, and Evans.

Chairperson Patterson described the history of Bill 14-208, and explained the purpose and intended effect of the legislation to improve administrative adjudications in the District of Columbia. She moved as a voice amendment a revised version of section 7(g), as recommended by the Office of the General Counsel. Section 7(g) in the draft committee print stated:

> "No agency of the District to which this act applies shall, after the Office of Administrative Hearings begins accepting cases for adjudication, employ or engage one or more hearing officers, either full or part-time, to adjudicate contested cases."

The revised version of section 7(g) that Chairperson Patterson moved at the committee meeting reads as follows:

> "Except as provided in subsection 7(i), no agency of the District of Columbia to which this act applies shall adjudicate contested cases under the jurisdiction of the Office of Administrative Hearings or employ hearing officers, either full or part-time, for the purpose of adjudicating cases under the jurisdiction of the Office."

Councilmember Ambrose stated that she is supportive of Bill 14-208 and she hopes that the new Office of Administrative Hearings will address the severe backlogs that exist at agencies such as the Department of Consumer and Regulatory Affairs. Councilmember Ambrose expressed concern that the legislation provides an exception for agency heads to adjudicate cases that fall within their jurisdiction in lieu of the Office of Administrative Hearings, under subsection (i).

Chairperson Patterson noted that the amendment to section 7(g) is intended merely to clarify that agencies cannot exercise overlapping authority with the Office of Administrative Hearings, and it is a technical amendment that does not alter the current authority provided to agency heads. Katherine Mills, legislative counsel for the Committee, noted that subsection (i) was not included in the version of the bill that Chairperson Patterson introduced in May, 2001, but that this section was added to the bill at the request of the Williams Administration. Subsection (i) is consistent with the current law in the District of Columbia and other jurisdictions, and the voice amendment did not alter this aspect of the committee print. The theory behind subsection (i) is that agency heads are responsible for the policies of their agencies and the ability to adjudicate cases may be relevant to this responsibility, although in practice it is extremely rare for an agency head to preside over individual cases.

Councilmember Ambrose requested that the Committee consider an amendment to omit subsection (i) when Bill 14-208 is considered on first reading based on a concern that this provision may be subject to abuse. Chairperson Patterson agreed to seek further input from the Williams Administration and the Council for Court Excellence on this issue. Chairperson Patterson noted that the Committee will also be seeking information from the Williams Administration regarding who will be responsible for writing rules and regulations that will need to be developed under the act.

Councilmember Brazil asked whether the Williams Administration is prepared to implement the bill as it is written in the committee print, particularly with respect to the number of agencies that will be subject to the jurisdiction of the Office under section 7. Chairperson Patterson responded that she had a series of meetings with the administration, including the Council for Court Excellence, that discussed the issues of scope and timing in detail. The committee print provides that the majority of agencies will be incorporated into the Office of Administrative Hearings on October 1, 2003, and a second group of agencies will be incorporated on October 1, 2004. The Williams Administration concurs that this is an appropriate phase-in period.

In closing remarks, Chairperson Patterson noted that it will be important for the Williams Administration to appoint a Chief Administrative Law Judge as soon as possible, in order to properly and carefully plan the start-up of the Office.

Chairperson Patterson moved for approval of the Committee Print of Bill 14-208, and the Committee voted 5-0, with members voting as follows:

YES:        **Councilmembers Patterson, Ambrose, Brazil, Chavous, and Evans**

25

NO:

PRESENT:

ABSENT:

Chairperson Patterson moved for approval of the Committee Report on Bill 14-208, with leave for staff to make technical corrections and changes to reflect the Committee discussion. The Committee voted 5-0, with members voting as follows:

YES:        **Councilmembers Patterson, Ambrose, Brazil, Chavous, and Evans**

NO:

PRESENT:

ABSENT:

## **ATTACHMENTS:**

(A)  Bill 14-208 as introduced by Councilmember Patterson and co-sponsored by Councilmember Ambrose.

(B)  Bill 14-219 as introduced by Chairman Cropp, at the request of the Mayor.

(C)  Notice of Public Oversight Hearing on Bill 14-208 published in the D.C. Register on May 18, 2001.

(D)  Memorandum from John Ferren, as Corporation Counsel, to Dr. Camille Barnett, as Chief Management Officer, on October 20, 1998.

(E)  Executive Summary of the Council for Court Excellence Report, "Creating a Unified Administrative Hearings Agency in the District of Columbia, September 29, 1999.

(F)  Committee on Government Operations Report regarding Comments on Bill 13-865, submitted on December 1, 2000.

(G)  Draft Fiscal Impact Statement from the Office of the Chief Financial Officer.

(H)  Testimony provided by witnesses at the public oversight hearing held by the Committee on the Judiciary on May 23, 2001.  Also attached as part of the hearing record is correspondence submitted to the Committee subsequent to the hearing.

(I)  Committee Print of Bill 14-208.